May it please the Court, Stuart Raphael v. Murphy-Brown. This is the lead appeal in the Smithfield hog farm nuisance litigation pending in the Eastern District of North Carolina. There are 26 lawsuits and over 500 plaintiffs, all of whom are neighbors of farms, and they and flies and buzzards from the farms amount to a private nuisance. There are a total of 89 farms in the litigation. Seventy-five are operated by contract, independent farmer, independent contractors, 14 are owned by the company. We've appealed with regard to the seven most significant issues that affect the cases. I want to focus today on three. Punitive damages, we think the Court should have struck them. Whether the farmers are a measure of compensatory damages for a private nuisance claim. With regard to punitive damages Why don't we start with the jurisdictional question under Rule 19, and if we assume that the farmers are necessary parties, tell us why they are indispensable parties under subsection B. I think that is the right question. They clearly are to be joined if feasible under A. We think they are indispensable under B because of all four factors that cut in favor of that conclusion. Number one, the effect of a ruling that the farm is essentially operating in violation of the law is that it can no longer operate. It should have been obvious that that ruling would require the farm to stop operating and to be depopulated. It clearly harms the farmer's interest. Number two, there is no way to lessen that impact based on anything that the court does. The plaintiffs and the trial court said, Murphy Brown could step in and spend a lot of money on odor control technologies and that would solve the farmer's problem. The question under Rule 19B is what could the court do to protect the farmer's interest? The reason the district judge erred was because the court put in the hands of Murphy Brown the responsibility of saving the farmer from this situation. That is a this court's jurisprudence teaches. Adequacy is measured based on whether the entire dispute would be resolved and it is not. What is left unresolved now? What makes it inadequate in that sense? There is a judgment against Murphy Brown. The farmers are not parties and there makes it inadequate? Because the farmer is in breach of the contract. The contract provisions at page 9285, the farmer had the responsibility to control odor. What legally protected interest of Ken laws would this verdict impair? The farm is shut down. They can't operate. Right, but what legally protected interest? That is an interest that the farmer has. The question is does the practical effect of litigation have an adverse effect on the absent party? It clearly does. But the point is made that whatever happened to Ken law was the result of an independent decision on the part of Murphy Brown to stop dealing with Ken law. And that could have taken place for a great variety of reasons. But I think it was certainly predictable at the outset that the effect of a nuisance ruling would shut the farm down. The case is a lot in that respect like the 9th circuit case that we cited, American Greyhound, where the issue was whether Indian gaming operations were illegal and the tribe wasn't a party. There could have been a great many reasons other than the verdict that Murphy Brown would not have wanted to continue to deal with Ken law. The question I have is when including a party such as Ken law would cause a federal court to lose jurisdiction. In this case, there would be a loss of diversity jurisdiction altogether. We've been a little bit reluctant or cautious to say that this is a necessary and indispensable party when the loss of federal jurisdiction would result. I think the four cases that we rely on, Homebuyers, which your Honor cited, Yashchenko, National Union Buyer, and Goonvar, all involve contract situations where there was an absent party and the court has said that a contracting party is the paradigm of an indispensable party. The verdict not only shuts down the farm, it leaves the farmer on the hook for having to pay the judgment to Murphy Brown. So the farmer's interests are clearly impaired. I don't mean to take up all your time, but you've raised a number of issues and I want to make sure that you have a chance. Could you talk to me a little bit about the punitive damages? Thank you, Your Honor. So the standard review is de novo, taking the facts in the light most favorable to the plaintiff. And I want to hear about that too, but as you're measuring your time, I'm particularly interested in your Dawbert arguments with regard to the expert witnesses and also the arguments of relevancy and prejudice with respect to the introduction of evidence about the non-party corporate entities and the references to the foreign ownership of the parents of the defendant. Okay. Thank you, Your Honor. With respect to punitive damages, de novo review, very high standard under North Carolina law. They have to prove by clear and convincing evidence willful and wanton conduct. And when you read their brief and when you look at the opening statement and closing argument, their theory of the case was this was a nuisance per se. Murphy Brown should have known this type of farming causes bad odors. You cannot base a punitive damage claim on a nuisance per se theory. It was their responsibility to prove conduct with respect to kin law that justified the award of punitive damages. This isn't a permit shield argument. It's simply in order to recover punitive damages. A lot of evidence before the jury about waste and the treatment of waste, and particularly about the fact that the waste was stored in open air pits for a good long time and also the treatment of the waste with the dead trucks. And that you allowed the condition to persist when some kind of cover to the open air pits would have significantly mitigated. In other words, they're just these open air lagoons that weren't covered. And there are trucks running by with all sorts of, you know, loaded with dead hogs, which they're not going to produce a beneficent smell or a nice odor. In other words, there were all kinds of conditions. They weren't hidden conditions. They would be open and obvious conditions, and yet they were allowed to persist over a good many years. A couple of points on that. None of these plaintiffs ever complained to the company about this farm. The bulk of the evidence in the case related to problems at other farms. It was undisputed that there were no complaints by these plaintiffs to Murphy Brown. Number two, I think that they exercised a great deal of control over kin law, and they were bragging about it. Murphy Brown says, I can direct, this is according to the contractual language, Murphy Brown says, we direct grower management procedures. We mandate design and construction of operations. We require technological enhancements, et cetera, et cetera. How many hogs are placed at a given operation? Now, it wants the control in terms of the contract that it executes and signs, and the question I have is whether you can assert the control in the contract to your advantage, and then all of a sudden back away from the control when it comes to a verdict and say, oh, we had nothing to do with it, and I'm just wondering whether you're wearing too much. We're not backing away from it. The control issue is No, you're saying we're distant. We didn't know anything about it, but yet the contractual arrangement gives you all kinds of control. So the starting point is, where's the willful and wanton conduct that satisfies the North Carolina standard? It can't be that you just used a lagoon spray field system or purchased hogs from a farm that did. It's got to be conduct specific to kin law. If the court looks at only two documents in this case, I really urge you to read the Attorney General Agreement, which is at page 9453, and the 2006 report of the designee under that agreement, which is at page 9477. Murphy, Brown, and Smithfield promised to implement odor control, environmentally superior technologies, if the independent designee concluded that they were economically feasible. What does economic feasibility mean? It means that they could certainly have to spend more, but if the cost of that control would reduce the hog population in all of North Carolina by more than 12%, then it was not economically feasible. And the designee concluded, after $15 million of money advanced by Smithfield and Murphy, Brown, that there was no alternative technology that was economically feasible. Murphy, Brown, was entitled to rely on that finding by the designee and on the Attorney General Agreement. So the question is, what happened at kin law that would warrant punitive damages? And they don't have an answer to that, because there were no complaints at kin law. There was nothing specific to kin law that would have told Murphy, Brown that they were on the hook for punitive damages. If I can turn to the expert question that Judge Agee asked about... Can I just ask a question? I want to hear the answer to that, too. How long did this trial last? It was about four weeks, Your Honor. Four weeks? Yes. Okay. And there, but 18 months before trial, there was a 12C motion to dismiss for failing to join the indispensable party. With regard to the expert issue, the court erred in admitting the testimony of Shane Rogers. The core of his testimony was he could detect bacterial biomarkers on the plaintiff's houses, and he used that as a proxy for odor, even though he admitted that there was no scientific study supporting that. Is your complaint with respect to Dr. Rogers that he was not DAWPert qualified? We argued he was not qualified, but I think the core error was in failing to conduct a DAWPert hearing and in allowing the pig two-back testimony, because he admitted that there was no study correlating that with odor, and he didn't even know if it smelled. Was DAWPert qualified, whether or not there was a hearing or not on the DAWPert issues? He wasn't qualified in that he admitted he was not an odor expert, and he couldn't tell you if pig two-back smells, so he couldn't use that as a proxy. And at the same time that the judge let that in, the judge excluded Murphy Brown's expert, Dr. Dalton, who was a nationally renowned expert in odor measurement, and her study at this particular farm, which showed that the odors were not nearly as significant as claimed, that was all excluded. The judge allowed... You didn't have an expert to counteract or to contradict Mr. Rodgers? Dr. Dalton did that, but her study was excluded. And he was allowed to testify... What about Clancy? Dr. Clancy criticized Dr. Rodgers' techniques in collecting the samples. So you did have an expert to counter that Dr. Rodgers? Yes, but that was at trial. The question was should Dr. Rodgers have been able to give the pig whether this error in the course of a four-week trial affected substantial rights? And this is a legitimate question that you raise. It's a legitimate issue. The question I have is did it affect substantial rights when you had Mr. Clancy to take on what Mr. Rodgers' testimony or Dr. Rodgers' testimony? Absolutely, because their key testimony was there's pig two-back on your houses. That's a proxy for odor. That should not have come in, and we weren't able to put in our counter testimony that objective measurements showed that odor wasn't significant. So it absolutely affected substantial rights, and the court applied the same Daubert ruling in all the later cases. So this is the lead case, and it will control the outcome of these issues. Now, I do want to get back to... That's where I'm not sure I agree with you, because what we're reviewing these evidentiary rulings on is an abuse of discretion standard, and the fact that the district court ruled one way with respect to a particular witness in a particular trial, does that necessarily mean that a different judge, for example, could not rule a different way? Well, I think this court's decision in these is a good example. You reverse as an abuse of discretion the addition of expert testimony. I think Dr. Rodgers clearly qualifies. I'd like, in the short time I have left, to get to two... No, I'm going to give you some extra time. Thank you, Your Honor. You've taken a lot out of that. Judge Agee raises good questions, and we want to explore both of those. Thank you, Your Honor. Before I... If I could just get one point in before I turn to the financial evidence. The damages issue is also heard in its ruling about its interpretation of the 2017 Right to Farm Act. That act clarified that under North Carolina law, the measure of damage is loss of property value, not discomfort. But the Right to Farm Act doesn't apply here. You would agree with that, would you? No, I... This is a pending case, isn't it? That's the entire issue, Your Honor. If it's clarifying, it does apply. If it's not clarifying, then it's perspective only. Doesn't the text of the statute matter? Of course the text of the statute matters, and there are two things on the text. It says that the Right to Farm Act does not apply to pending cases. When I read that, that set the foot. When I read that, I thought, wow, they're right. It's perspective only. Then you read Wray. If you're not a North Carolina lawyer, and you haven't read Wray, you're going to think that's really compelling. When you read Wray, Wray involved exactly the same language. It said, the amendment becomes effective on October 1 and applies to claims arising on or after that date. And the Supreme Court of North Carolina said, that language is not illuminating because effective date language like that is in every bill. And so what's more important is that the title of the bill, which says it's clarifying, the fact that it was... The text says the amendment says it applies to cause of action arising on or after its effective date, which would seem to exclude pending cases. It would if you hadn't read Wray. The same language was in Wray, and the court said that you don't follow that because it's in every bill. This is the prototypical case to certify the issue to the North Carolina Supreme Court. It sure would, but North Carolina doesn't... They're the only state in our circuit that won't let us do that. That's exactly right. That's exactly right. A couple other points before I turn to the financial evidence issue. The law is super unclear in North Carolina. The judge himself said that twice, that he thought the law was unclear. So the key thing the plaintiffs rely on is the enactment clause, which as Wray says, it's not illuminating. They rely on floor statements that go their way. We have floor statements that go our way, and either way under North Carolina law, they're inadmissible. So what's left? They say that there was an amendment while the bill was in the legislature. Initially it said the bill would apply to pending cases. That was taken out. Language was put in that said it won't apply to pending cases. That was taken out. With respect to the punitive damages and with respect to this whole case, and as I say, we can give you some extra time here. This is something with a lot of issues. I'll just speak in a general matter of what troubled me. When you look at the complaint and you look at the trial, the hog farming here, it certainly provides many jobs in eastern North Carolina, and I understand that, and it's very important to the economy of the eastern part of the state, and that's surely true, and it is important not only that, but to our national food supply, but it's harmful to the people who live nearby. You look at the amicus briefs, you look at the complaint, it's got to be environmentally harmful to the waterways and seeping into the water. Nobody wants another Flint, Michigan tragedy down the road, and this can't be good for children's respiratory systems. Just these odors, you know, we're talking about wheezing and headaches and things like that, and the inhumanity to the animals and the fatality rate among the hogs, I suppose they're just animals, and maybe some people think they're ugly and treat them the way we want, but it, you know, I just kept reading this case and I'm thinking to myself, you know, these are, if this were my property, I would be outraged at some of these conditions that were allowed to persist, and I think, you know, our less fortunate fellow citizens, they have property rights, too, and many of the homes surrounding an operation of this sort, they don't go for a high price, but the people that live in them, you know, they have a right to good health, they have a right to their enjoyment of their property. If I could respond to two things, and I was, and I just thought if this were some McMansions surrounding these hog farming operations, if these were the houses of the affluent, wouldn't those conditions, if these were more politically powerful, wouldn't those conditions have been cleared up sooner rather than later, and that is my problem. Yeah, I think a couple of things, Ron. I think you're getting a slanted view of the facts because the objective odor testimony was not allowed in. The odor is not, as they claim it is, but we couldn't put that evidence on, but more fundamentally, what you just said, Judge Wilkinson, is what a legislator would say as to why this type of farming should not be allowed. I think this is a separation of powers issue. The legislature decided in 1997, and again in 2007, to grandfather and specifically allow this type of farming. It's regulated, it's permitted, there's a general permit. Virtually every farm in North Carolina operates this way, as it does in other states. I do respect the legislature. We respect the Right to Farm Act, the date of its application, but the legislature didn't repeal the common law rights of the citizens of North Carolina, and there's also discussion of vested rights and the danger of appealing vested property rights retroactively. Okay, well, can I unpack that a little? The legislature did not repeal the common law cause of action of nuisance. It certainly did not, but it clarified that the measure of damage is loss of property value. There was no vested right because that law was unclear, as the district judge twice said. But getting back to the separation of powers issue, it's not just the legislature, Your Honor. Read the Attorney General Agreement. The Attorney General agreed that this practice was proper and could continue less than until superior technologies were discovered, and Murphy Brown funded $15 million towards that. What the plaintiffs are trying to do is use the courts to second guess a legislative judgment and an executive judgment. What legislative judgment? I thought it was not a per se defense. It's not a permit shield defense. On the punitive damage issue, we're saying that you're advancing it as a per se defense, aren't you? I don't think we are. I did not think the compliance with the regulatory regime was necessarily a per se defense. We're not saying it's a defense to liability. We're saying that if you're in compliance with the regulatory regime, you can't be hit with punitive damages unless there's independent evidence of something you did that was really bad, and they don't have that evidence with regard to Ken law. Their case is based on the idea that you shouldn't have used this farming system at all, and I understand that people can think this is not a good method of farming, but that's a legislative judgment, and if they're going to get punitive damages, you've got to prove it for this farm. Under your theory, under the theory that you articulated, every farm would be subject to punitive damages. That just can't be right. No, it would not be. Every farm might be, but the question is, is this automatically removed from the purview of a jury? You do have jury rights, and you have legislative rights, and there's not a legislative enactment that we're refusing to give respect to. We've never said it's automatically removed. What we're saying is unless there's evidence, clear and convincing evidence, that a reviewing court finds compelling, it shouldn't have gone to the jury on punitive damages. That's all we're saying. That's all we're saying. But North Carolina has mitigated the effect of punitive damages. There's an overall ceiling on them. There's a cap, but the jury, right, which dramatically reduced the award. Well, in this case, but in Artists, there were million dollar compensatory awards, so there's a hundred million dollar judgment in that case because of the punitive damages. So this is going to, I mean, this shutdown, every farm that's been found to be a nuisance has been shut down, and I understand you can say, well, Murphy Brown could pay for them to continue. Well, Judge Agee raised another question. If you want to say more on the expert testimony, I'm more than happy to hear it, but the other question that Judge Agee raised was with parent profitability and executive compensation. Yes, Your Honor. Thank you. I know you raised that, and I'd like to hear your response to Judge Agee on that point. The plaintiffs, as you know, repeatedly emphasized the executive group. We think that they are, it was wrong to say that that was somehow relevant to Murphy Brown's ability to buy odor control technologies because that would have required a veil-piercing claim to treat all of these corporations as one. And I think when you read the appellee's brief, they don't address the veil-piercing issue. Murphy Brown is an independent company. Its second-tier owner is Smithfield. The trial court treated all of those entities as one and the same, and that violates fundamental principles of corporate governance and law. Your 30-beat witness opened the door for that type of testimony. What's your response to that? I don't think he did. Murphy Brown's finances were certainly fair game on punitive damages. We have a separate issue about whether the judge erred in failing to bifurcate. I mean, all this evidence came in in the compensatory phase. But what we objected to was the Smithfield financial information and the WH group financial information coming in. Their argument that you could consider that to show that you could afford odor control technologies is like saying if somebody has a claim against my daughter, she could come to me and I could give her some money to help her out. And now she's responsible for everything that I could do to help her. That's never been the law. This is a piercing claim. And they didn't allege a piercing claim. They didn't try to prove a piercing claim. And it violates North Carolina law for them to try to get all that evidence in about a piercing claim. I thought because of the whole question of abatement and whether the parent companies such as Smithfield were capable of using the funds to abate the damages. But I don't think that you can draw that inference unless you satisfy a piercing standard. Were there any limiting instructions with regard to this? Not with regard to the financial information, no. The district court let it in. I think Judge Agee indicates that you answered his question. Thank you. And I appreciate the extra time. Thank you, sir. Mr. Brackenridge, we'd be happy to hear your side of it. Thank you, Your Honor. Good morning and may it please the court. A couple of quick things that I want to address right off the bat. First of all, I want to go to the closing argument of Mr. Keski in the trial court and just point out that at page JA9051, he makes it very clear, quote, we are not asking for any farms to be shut down. We are not asking for any changes to be made except the changes that would be made to protect the neighbors and the environment. They know what those changes are. They can afford to do them. That was based on testimony provided to the jury. The jury understood that there were many ways in which Murphy Brown could have abated these problems and then chose not to. So this is not a case of an industry under attack. This is not a case where North Carolina agriculture will fall apart. This is a case where Murphy Brown is being held responsible for its own actions. The other thing I'd like to address is the misstatement. That argument goes to the effect of the evidence of the parent corporations. It looks like at least on its face that your clients got the benefit of all the evidentiary provisions of a corporate piercing claim, but without your ever pleading it or approving it, which could be fairly prejudicial. I mean, when you read the transcript and you see these multi-million dollar figures of non-parties brought into the case, it's hard to avoid the conclusion that that would not have had some effect on the hearers, the jurors, particularly when it's wrapped in with these references to foreign influence. I don't see how any of that could possibly be relevant or how it could be mitigated. Well, Your Honor, two things. I will say it was both relevant and it could have been mitigated. I have three things because I also would have to disagree with the premise that it's going to have a huge effect on the jury. But first of all, it was relevant insofar as there's under North Carolina nuisance law, the concept of value to the community. And so the fact that funds are being, they were, Murphy Brown relied on the concept that there are jobs that are being created here. On that, I would say that there also would be jobs that would be created if they put covers on the goons. And then so the fact of- of a Chinese holding company that's not a party to the litigation, relevant to what this defendant does or this defendant is liable for. Okay. Well, the, the, the, the X billion dollars part is very relevant insofar as Greg Schmidt, the president of Murphy Brown said that's where they would get the money. So that's, that goes to whether or not Murphy Brown could abate the nuisance. And so therefore a judgment against Murphy Brown based on- Murphy Brown was legally capable of reaching those funds? I mean, that evidence came in on your cross-examination, didn't it? Or your direct, your direct examination? It did, but that's evidence that it's legally capable. The president of the company said that it- Did Murphy Brown say it could get the money from Smithfield? Yes. Well, let me ask you this. Isn't there a difference? Because I'm, I have the concern that Judge that, you know, all the evidentiary rulings went against your opponent here and some of them, you know, they were a little bit questionable. And I'm wondering if there isn't a difference between admission of the corporate profits and admission of the executive salaries. It may be, maybe the corporate profits could be used in the interest of abatement, but what relevance does someone's executive salaries, the amount that they're getting personally paid, since when do corporate executives, how would they be expected to ship in 10, 15% of their salary in the interest of abatement? And isn't that just throwing a dead rat on the table of the trial? Well, Your Honor, first of all, I'd like to disagree with one of the premises that you had, that the evidentiary rulings were one-sided here. They were not one-sided at all. We had several experts that were not allowed in. We had Dr. Wing's testimony, greatly curtailed by the court. The court definitely had- You had some experts excluded? Yes, we did, Your Honor. Like who? I forget their names. Off the top of my head, I can always offer you a 28K, but there were literally at least two experts who were excluded. What were they, what were your excluded experts going to testify to? Off the top of my head, I don't remember specifically, but the concept that somehow all these rulings just went against- Were you the trial attorney? I was not, Your Honor, but nonetheless, I'm happy to provide that information in a 28-J letter after that. No, I take your representation, and the point you're making is that the evidentiary rulings didn't fall all on one side. That's right, Your Honor. And that there were several plaintiff's experts that were excluded? Right, Your Honor. But does that speak to Judge Agee's question about the failure to hold a Daubert hearing? Well, I don't think it does totally, Your Honor, because when it comes down to it, each expert has to be judged on his or her own merit, and so when we're getting to Dr. Rogers and we're talking about whether there needed to be a Daubert hearing, I think there's a close characterization of what Dr. Rogers was there to testify to. Murphy Brown keeps suggesting that Dr. Rogers was there to testify to measurement of odor, and he was not. He was not an expert on that. He did not testify on that specifically. He was there to testify about the movement of chemicals through the air, and he testified on that very capably, and so when he said that he did not have peer-reviewed literature allowing the use of Pig 2-Bac as a proxy for odor, sure, that's true. He wasn't using Pig 2-Bac as a proxy for odor. He was simply using Pig 2-Bac as an example of something. Here's his answer on direct examination. So if you go and you go search for the Pig 2-Bac at the Smithfield site and you find it, what can you tell members of the jury about odor from that answer? The odors are going to transport in a similar way with the particles, and that means the likelihood of odors is very high at that site. So what concerns me in this case is, at least it appears on the surface, that there's a witness, expert witness for the plaintiff, who is going to testify as to the central issue of the common law claim, odor and nuisance. And so there's no peer-reviewed literature that I'm aware of. There's no scientific testing for his method. There are no academic scientific articles with regard to it. But yet he's allowed to testify about this relationship to odor, and he does it as if it's an objective measure. Of course, your argument is, well, it's subjective. But then when it comes to Dr. Dalton, who would appear to be DAWBR qualified with lots of testing, peer-reviewed scientific information, who's also going to testify about an objective method, that testimony gets excluded, and I have a great deal of difficulty seeing the equity in that. Well, Your Honor, I think that that gets to the mischaracterization, because Dr. Dalton was not there to testify and did not testify even in the segment you just read as to the magnitude of odor. He was there about the existence of odor, and so, or the existence of, more accurately, the existence of chemicals that cause odor. He did not testify to the magnitude of odor. I'd like to come back to that in a moment. I will note that there is one point at which he uses the phrase, strong odor, in response, I believe, to direct examination, it may have been cross-examination, and Murphy Brown relies on that to suggest that he became an expert on the problem. I mean, your individual clients could get on and testify all about the hog odor. When I was younger, I worked on this. They stink. I know that. Anybody that's been on a farm around hogs knows that, and that's certainly valid testimony from their standpoint. But when you come to expert witnesses, the likelihood of confusion and misleading the jury becomes very high because they are experts, and that's the difficulty I'm having here, particularly when I look at our prior cases like Neese, and you have the failure to do a Daubert hearing for this type of testimony, and what would appear to be a Daubert qualified witness on the other side is not permitted to testify as to those similar factors. The inequity of that causes me some degree of concern. There is no inequity, and I'd like to get through both what Dr. Dalton was testifying to and what Dr. Rogers was testifying to, and why Dr. Rogers was not qualified to testify on the magnitude of odor. Just like Dr. Dalton did not testify on the magnitude of odor, he testified on the existence of odor, the strong likelihood of some odor, not that it would be a strong odor. Then there was one point in which he mentioned strong odor, and there was no objection. Had there been an objection, probably we would have had him rephrase his answer because the question didn't even ask for that information, but nonetheless, Dr. Dalton was there to testify on the existence of odor. There's no debate that pig's back only exists in hog feces, and that it then had to have traveled through the air to then exist on the homes of the plaintiffs. Now, when we get to Dr. Rogers testifying on the subjectivity, oh, and I should add that Dr. Dalton was then countered by Dr. Clancy in trial. He was tested in front of the jury. The jury had the opportunity to evaluate that. Now, when we talk about Dr. Rogers, she was there to testify that odor can be measured objectively, and then she objectively measured the odor and found that there wasn't an odor. The problem with that testimony- I'm sorry, I may have conflated it. Yeah, I conflated it, and I apologize. Dr. Dalton was there to testify to the magnitude of the odor and that her purportedly objective measure of the odor, but two problems existed with Dr. Dalton's testimony. First of all, she admitted in her deposition that she had never actually reviewed or was unfamiliar with the North Carolina standard for nuisance. She's trying to say that this is objectively not a nuisance without being familiar with the law of nuisance in North Carolina, so that was disqualifying. Another thing that was disqualifying- Well, why wouldn't that go to the weight of the evidence, just like you'd have, assuming you were disqualified, Dr. Rogers' testimony under cross-examination go to the weight of the evidence on the other side? It wouldn't go to the weight of the evidence, Your Honor, because that's the ultimate question, and she's testifying that she doesn't know the answer to the ultimate question, and yet she says she plans to testify on the answer to the ultimate question without understanding the standard for the ultimate question. Another problem with Dr. Dalton's testimony is that she conceded that she could not call the residents, the plaintiffs' perception of the odor as strong, unreasonable, and so she undermined her own ultimate conclusion. Her ultimate conclusion is, oh, this is not an objectively unreasonable odor, but then she says, I can't say it's unreasonable. Why would that go to the weight of the evidence through an impeachment? Your Honor, again, I would say that that goes to more than just the weight of the evidence. If she's completely undermined her own conclusion on an ultimate question, then I think that that renders her excludable. And I would also then loop around back to the whole concept of inequity, because as I mentioned before, Dr. Dalton was not suggesting otherwise. Dr. Dalton was not there to testify on magnitude of odor, and his testimony on the existence of odor and the pig to back indisputably being something that only exists in hog feces was then offered, Murphy Brown then offered a counter-expert in Dr. Clancy, so it's not as if there was any sort of inequity there. There was expert testimony on both sides on these issues. Now, going to the... I have a punitive damages question. Actually, it's a question that was posed by opposing counsel. He asked, what happened at Kinlaw that would have subjected Murphy Brown to punitive damages? What's the answer to that? What is the... The question is, what happened at Kinlaw that would have subjected Murphy Brown to punitive damages? I think that is exactly where I was just going. So at page seven of their reply brief, Murphy Brown says, and I'll quote, a lagoon and spray field system could become a nuisance in practice depending on actual conditions. And then it says, distance to neighbors, lack of buffers, prevailing winds, farm operation, and other factors. All of these things were things on which there was testimony about Kinlaw operation at trial. So for instance, distance to neighbors, you see in our brief where we have the picture of how close they are to the neighbors, how close Murphy Brown placed this operation to the neighbors who were already there before the farm came into existence. And there's testimony on that at page JA7158. Lack of buffers. There's testimony at page JA6974 talking about how Murphy Brown cut the trees in a way that funnels the chemicals toward the property of the neighbors. Farm operation. There's plenty of testimony about the nuisances created by the trucks coming in at 2 a.m. with all their odors and all their honking and all of that. That's farm operations. Murphy Brown is the company that decides how many trucks come, when they come, and how they come. Murphy Brown is the company that placed the road right in front of these people's homes when it didn't have to. Your opposing counsel says that, obviously we didn't read every inch of the record, so that's why I have to ask, says that none of the plaintiffs ever raised these complaints to Ken Law or Murphy Brown. Is that accurate? Well, it's not accurate as to whether they raised it as to Ken Law, because Joyce McKeever did speak to Ken Law, Billy Ken Law, about it. But in the end, ultimately, I would say it's irrelevant, because the question of complaints goes to their knowledge. Let's do the factual part first. Did any of the plaintiffs in this case raise complaints prior to the filing of the suit in this case in the state court, that you just recited, to either Murphy Brown or Ken Law Farms? Yes. Joyce McKeever complained to Billy Ken Law. One person did complain to Murphy Brown about truck speed on the road right in front of their homes. In the end, though, that goes to knowledge. Complaints are not an element of liability or punitive damages here. They're just evidence of knowledge, and there's plenty of evidence of knowledge supporting the jury's verdict such that complaints are unnecessary. They knew where they were siting this farm. They knew they were putting these trucks 30 feet from these people's homes. They knew they were sending those trucks there at 2 a.m. to honk and noise with the odors. They knew that they had insisted on this hog operation going within a half a mile of these neighbors. Mr. Ken Law actually originally proposed a site that was about a mile away from any neighbors, and Murphy Brown told him he could not site his farm there because there was a nearby hog farm, and the airborne chemicals from his farm might make hogs sick at the other farm. Well, their own expert testified that those chemicals that could make hogs sick are also the chemicals that carry odor. So they knew very well when they placed this farm right by these neighbors that they were doing so in a way that the odors would carry to their properties. What are we supposed to make of the size of the jury verdict which awarded $75,000 in compensatory damages and $5 million to each plaintiff? I think you're supposed to make of it that the system worked, Your Honor, because in the end. I mean, that's a pretty steep verdict. It is a very steep verdict, Your Honor. I mean, $5 million in punitives to each plaintiff? Yes. It's a very steep verdict for some very egregious activity, but North Carolina legislature has seen fit to put into place protections against that becoming the actual judgment, so the actual judgment here is $3.25 million. There is a system in place put together by the North Carolina legislature and the rest of the government that created, and of course, the operation of the common law that created this situation where. So it was capped at $3.25 million? Yes, Your Honor. And so there's no grand risk to the industry. There's no grand risk to hog farming or the North Carolina economy. In the end, all it takes is for these abatable nuisances to be abated. With respect to the expert witnesses, is the fact that the district court ruled in a certain way with respect to the admission of evidence, does that necessarily establish any sort of template for succeeding trials? No, Your Honor. Every trial has its own facts and its own witnesses, and they are all unique. But would a district court think, well, I'm admitting, I'm committing potentially reversible error if I don't allow this expert to testify, or if I do allow that expert to testify, what's? Well, Your Honor, while we're on the subject of subsequent trials, which I, admittedly, I don't think should be in consideration here, but since we're on that topic, I will say that their expert, Murphy Brown's expert, Dr. Dalton, did testify in subsequent trials, and she wasn't completely excluded from testifying at this trial. Just certain testimony was excluded. She testified extensively at subsequent trials, and it didn't make a difference. Let me, before your time runs out, let me ask you a Rule 19 question, because I'd ask opposing counsel about this. If we just assume, for purposes of argument, that the farmer's skin law is a necessary party, we go to 19b on whether they're an indispensable party. There appears to be some prejudice to them here, whether or not that's cognizable. They may be debatable, but I'm particularly interested in B3, whether the judgment rendered in their absence would be adequate. Tell us what your view is on that. And if, may I have the opportunity to answer the question? No, no, we gave your opposing counsel some extra time. We're going to give you some, too. Thank you, Your Honor. And I'd like to challenge your premise after I directly answer your question, Your Honor. But the direct answer to your question about the judgment's adequacy is that this is exactly an adequate judgment. This is exactly what needed to happen. Murphy Brown needed to know that its policies and its choices led to liability so that it could make new choices that allow the nuisances to be abated going forward. And that's really all that has happened. Going back to subsequent trials, the things that have come out in subsequent trials is that they have, in challenging the ability to get punitive damages, they have stated that they completely changed their policy on trucking. And when trucks can roar in front of people's homes, they've changed their policies on refrigerated dead boxes. So, you know, so, yes, the judgment has been adequate. Now, getting back to your premise, which is, you know, assuming that Murphy Brown, I mean, assuming that Ken Law Operation is a necessary party, and I definitely would not assume that here because, first of all, the necessary party No, I just assumed that so we could get to the 19B part of it. Okay. Well, fair enough, Your Honor, because they are not a necessary party under the standards established. The cases cited definitely involve cases where a contract was invalidated and the beneficiary of that contract was left out in the cold and not allowed to participate. Here Ken Law was allowed to participate in the closing arguments. Murphy Brown said Ken Law testified against us, and yet, and so Ken Law was completely aware of what was going on. There's no need to protect an absent party insofar as they somehow didn't know what was happening. They could have brought themselves into the case. They did not claim an interest. And so, in light of that, it's plainly established that they are not a necessary party. They are not an indispensable party. The right party was sued here, the responsible party, Murphy Brown, unless there are any further questions. It's a four-week trial. Four-week trial, Your Honor. And that's sort of, a lot of these evidentiary calls, I don't think I would have necessarily ruled the same way had I been on the trial bench, but, you know, it's an abuse of discretion standard. It's a very high standard. And standard of review matters on this. We thank you very much for your argument, and then I'd like to hear from Mr. Raphael in rebuttal. Thank you, Your Honor. Mr. Raphael, when you start, if I could get you to respond to opposing counsel's comment that your corporate representative said that Murphy Brown could get abatement money, that it would be able to obtain the abatement money from the corporate parents, is that correct? I am not sure that that is correct, but I think it doesn't matter because if the requirement were to put lagoon covers and other odor control technologies on these farms, the AG agreement and the designee's findings were it would reduce the hog farm population by up to 50% in North Carolina. North Carolina is not the only state where you have hog farms. There are many other states. And so the cost of remediation for dealing with these issues greatly affects the market. That's why you had the AG agreement and the designee deciding whether there was a feasible technology. I do want to correct a couple of misstatements. It's true that there was never a complaint by any plaintiff to Murphy Brown. With regard to the one complaint that Mr. Breckenridge mentioned to Kinlaw, page 7872 of the joint appendix, the testimony by Kinlaw was at line 9, the only thing that I ever received anything on was in a conversation with Ms. Joyce, and she said once in a while was her answer she could smell it, questioned did she indicate in any way that that was impacting her ability to use or enjoy her land, answer, no, sir. So there was no complaint either to Kinlaw of any significant problem with the odor or to Murphy Brown. So it really does come back to where is the willful wanton conduct at Kinlaw? Was that the only, I forget the lady's name, but did she testify? She did. Did she testify that she had complained? I don't recall that. The plaintiff's general line was we didn't think it would make a difference to complain, which was obviously an excuse for why they didn't complain, but the focus is on what Murphy Brown knew, and it was reasonable for Murphy Brown. How do we get around this contractual language where Murphy Brown is claiming and ever claiming detailed control over practically every aspect of Kinlaw's operations? Where's the willful wanton conduct? That's what's missing on punitive damages. Control is a different issue. It comes up in other places, but with regard to punitive damages, we've got to have willful wanton conduct, and we don't have it with regard to Kinlaw. Your Honor made a passionate argument for why this method of farming shouldn't be used, but North Carolina has reached a different judgment, and following that legally permitted system cannot expose you to punitive damages unless there's independent conduct that warrants it, and they didn't have that independent conduct here. Indifference to known dangers. Where was the indifference to the... Also, they're saying that you were designating where roads would go, and you were designating the hours at which the trucks would come by. In other words, you're saying that your role was purely passive and a sin of omission, but I'm just wondering if the evidence... There were no complaints, Your Honor. ...didn't indicate that you took an active role in many of the decisions. There were no complaints about that to Murphy Brown before the suit was filed. There's also lots of... Do they need to be complaints, or when you are in a relationship with someone for which you claim to be the controlling party, wouldn't the contract itself give you the right to or indeed the obligation to examine Ken Law's operations and inform yourself in some way about that? The testimony was Murphy Brown did that. It regularly audited Ken Law. There were no violations of North Carolina law by Ken Law. May I address the expert issue before my time is up? You can touch whatever you'd like. Thank you, Your Honor. Judge Agee, I think you hit the nail on the head. I think the district judge did not treat the experts even-handedly. The rulings were not even-handed in this case. The expert that Mr. Breckenridge mentioned on their side who was excluded was a cultural anthropologist, not an expert that went to the core issue in the case, which was severity of odor. We agree that each expert has to be evaluated on his own terms. Dr. Rogers was not an expert on the relationship between pig two-back as a proxy for odor. He admitted that. That testimony should not have been allowed in. It was hugely prejudicial because the plaintiffs were allowed to say there's pig feces on your home and that's a proxy for odor. Very prejudicial. We couldn't counter that with objective testimony from Dr. Dalton that the odor wasn't as they claimed. Let me just end by saying this really is a separation of powers issue. The plaintiffs are trying to use this case and other cases that are following it to force Smithfield and Murphy Brand to abandon the Lagoon spray field system and to force hundreds of farmers in North Carolina to abandon that system, which is perfectly legal under North Carolina law. You can't force a party to do that with the cudgel of punitive damages without evidence that in this case, as to these plaintiffs, there was misconduct that warrants it. And for that reason, the court should reverse. Thank you. Thank you. We'll come down and greet counsel and take a brief recess. This Honorable Court will take a brief recess.
judges: J. Harvie Wilkinson III, G. Steven Agee, Stephanie D. Thacker